We'll hear the next case, Burrell. I'm trying to figure out if this is the most brief I've had. It's up there. Welcome. Good morning. Good morning. May it please the Court. My name is Juno Turner, TORS Justice Counsel for Plaintiffs' Appellants. I've reserved three minutes of my time for rebuttal, and I've also given the Department of Justice as amicus four minutes of my time to address the seating requirements for a CBTA claim. Plaintiffs' Appellants worked in grueling conditions at a recycling plant for pennies an hour. They worked in 100-degree heat, sorting through trash containing needles, broken glass, fecal matter, vomit, and other unpleasant and dangerous items, all in order to gain access. I hesitate to interrupt you in the dramatic reading of that, but I think we're good on that. So here's my question. If there's no right to work relief, how is providing choices unduly burdensome? So, Your Honor, the issue in this case for purposes of the CBTA claim is whether the defendants coerced plaintiffs' work at the recycling center. And we allege that this doesn't involve the work release program. We allege that the plaintiffs had to work at the recycling center in order to get access to the work release program that the state court had deemed them eligible for. Right. And my question is, if you don't have a right to work release, right, then it would seem that the choices are, you know, just wait out your six months or, in Perel's case, 12 months, right, or pay the purge amount. I understand you want to get to work release because the money that, as I understand it, Your Honor, from RONC, the money that you're earning from working at the recycling center is going into commissary, so isn't used to pay off the debt. So if you don't have a right to work release, why isn't it the stark choice of pay the purge amount or stay in jail? So I think the TVPA is not concerned with choices that the plaintiffs may or may not be able to make. And I just point the court to Bariantos and the other immigration detainee cases that involve voluntary work programs, right. And so in those circumstances, there is a program that's ostensibly voluntary. And those individuals are immigration detainees. Presumably they have some choice. They could, for instance, give up their immigration proceedings that are the cause of their being detained in the first place. But really what's at issue here is the defendant's conduct. And so they're knowing that these individuals were in circumstances that would motivate them to need to earn money and work release in order to, when they leave the prison, they do get access to those commissary funds. That case is distinguishable because you're talking about the relinquishment of a legal right. And so I understand in those instances to say, well, you could drop your request to remain in the country or you could do that. That's certainly arguably coercive, right. But I think Judge Gradaway's question is, there's nothing that's occurring here that you've alleged. It wasn't going to occur as a result of the state court's evidentiary determination that an amount due could be paid. And so at that point, the civil contempt process comes in if the plaintiffs choose not to comply and they have an option. They can comply or they can serve out their term of civil contempt. But the work release program seems to stand entirely separate from that as an optional choice that isn't tied to the relinquishment of a legal right like the immigration cases were. I think that, I mean, there is an element of choice there, Your Honor. But the question is whether or not the defendant's conduct was coercive under these circumstances. And so while it's possible that, you know, the element of choice could potentially impact our claims at some later stage of the case, that is just one piece of evidence in determining the voluntariness of plaintiff's waiver. So taking into account just at the pleading stage the other evidence in our allegations, including the really unpleasant working conditions at the center, there's a strong inference there that no one would work under those conditions for 63 cents an hour unless they really had to, unless they were quite desperate. And so we feel that that is sufficient to allege a claim under the TPPA, particularly when the statute is focused not on the choices that the plaintiff may or may not have made, but instead on the conduct of the defendant. Suppose the conditions were exactly the same, but the pay was $100 an hour. Would you have a claim? I think it would be a more difficult claim, Your Honor, because it is... What would the claim be that you would articulate in that circumstance? That we would nevertheless, I think, be able to articulate that the work had potentially been obtained through, you know, through coercive conditions, but it would also be obtained through high pay, right? And typically these are jobs that would be paid somewhat highly because they're very difficult and unpleasant. And generally jobs that are difficult and unpleasant are highly paid to entice people to do the work. So it would be a tougher claim to say, no, they were enticed by the promise of work release. I think there would be, you know, an argument that, well, what they were really enticed by is the promise of money. So let's just change the hypo a little bit. They're paid minimum wage, which I guess in this instance would be $7.25, am I right? I believe so. Okay, so they're paid $7.25. Do you have a claim? I think it would be a more difficult claim, Your Honor. Again, I think that the circumstances, the dire financial circumstances of these individuals, the exceedingly difficult working conditions, and the almost infinitesimally low pay are what, together, we believe are sufficient to state a claim on these facts. Why didn't you make, if the complaint includes an allegation, that the plaintiff, I think at least Mr. Burrell, could not pay the purge amount, right? Tell me more about that. What is the basis of that allegation? At the time Mr. Burrell was introduced to the concept of working at the center, he was not in a position to pay. And we have additional allegations showing how quickly he fell behind on his child support payments following a workplace injury. So within a matter of weeks, he was in a position where he was not able to pay. I know you don't allege this, but is it Mr. Burrell's contention that at the time the purge amount was set by the Pennsylvania State Court, that he was not able to pay the purge amount? Because my understanding is that that was a determination after an evidentiary hearing, that he had a present ability to pay that amount and that the payment of that would then avoid the process of civil contempt. So is that incorrect? That is a determination that the state court made. I'm not sure, frankly, Your Honor, whether there's an evidentiary hearing or not. But yes, the state court did make that determination. And we understand that the district court's view was that we could not challenge that determination. But did you challenge that determination? We allege that he did not have the money to pay at that time or subsequently. There is a process for appealing that determination, right, at any time. You can go back and say circumstances change or the court got it wrong, and I'm assuming none of those steps were taken. My understanding is that there's a process to seek modification of the child support amount, but I'm not aware of the process to change the purge itself. But I think, I mean, what's important here is that Mr. Burrell was in the prison for 12 months, and he worked in the center for six of them. And so even if we're not permitted to allege that at the time that his purge was set, he did not have the money to pay it, it's certainly reasonable to infer that as time went on, these individuals who were largely indigent to begin with, their death continued to amount, their child support at minimum continued to amount, and it's reasonable to infer that the day-to-day expenses were less. That didn't change the purge amount, though, right, unless I'm misunderstanding. The purge amount was the necessary tool to resolve the civil contempt order. That amount doesn't change during the duration of the civil confinement, right? That's correct, but to the extent that if Mr. Burrell had $2,000 in his bank account that first day he showed up, if he wanted to keep his lease at home, somebody would have to keep on paying rent and so forth. And so we think it's reasonable to infer that, at minimum, the circumstances continued to worsen as the confinement continued. However, we also don't believe that having, plaintiffs don't have a requirement to exhaust all of the possible exits available to them in order to be able to state a claim for a violation of the TVPA. It may be at some later time that the jury or perhaps the court on summary judgment would weigh that evidence against other evidence of the coercive nature of the conditions to determine whether, in fact, plaintiff's labor was coerced. What if we thought that the allegation in the complaint that Mr. Burrell didn't, at the time the purge amount was set, have the ability to satisfy that amount? What if we thought that wasn't sufficiently flat? In other words, now the complaint doesn't have a grounding that the purge amount cannot be satisfied. What, if any, impact does that have on your claim? I don't think, I mean, we still are able to state a claim because it's reasonable to infer that their financial circumstances, which we fled were dire, even putting aside that, you know, that they didn't have the money to pay the purge. It's reasonable to infer that they would have continued to accrue debts and that their financial situation would have become worse during the period of their incarceration. That combined with the evidence or the allegations about the difficulty of the working conditions is sufficient to suggest that this labor was obtained through coercion. I mean, it's obviously the plaintiff is in control of his complaint, but I wonder why those allegations were not expanded upon if they were there. Because it seems as though it would ground your story and the cause of action in something more concrete. That there was a state court determination. The state court determination was still fully false. At the time of the determination, Mr. Burrell didn't have these assets. He had these obligations, et cetera, et cetera, et cetera. So now you're beginning to paint a story of, well, as well pled, but the facts suggest that Mr. Burrell had absolutely no option, right? But that's where I think your sort of choice coercion theory starts to come into play. But all the complaint seems to say is, well, he didn't have the money, despite the fact that there was this process in the state. Well, I mean, we could, I suppose, amend to add those allegations. I think our view, Your Honor, is that we don't need to, because the additional allegations strongly suggest that this process was coercive. And more importantly, because the TVPA is really focused on the conduct of the defendant and not the potential choices that the plaintiff could or could not have made. Is there any question of whether the TVPA extends to situations like this? Ostensibly, it seems to be focused on addressing victims of sex and human trafficking. How should we think about the breadth of the TVPA as you assert it applies here? So, Your Honor, although the legislative history in some respects suggests that the TVPA was intended to combat sex trafficking, it is written much more broadly. And it explicitly seeks to combat forms of worker exploitation that don't rise to the level of involuntary servitude. And so it's intended to be and is broader than physical or legal coercion contained in the 13th Amendment and also encompasses much more than traditional sex trafficking. And so, again, there's a number of cases involving civil immigration detainees who are participating in allegedly voluntary work programs. And there's a number of cases. I think the clearest one is the 11th Circuit decision in Barrientos talking about the intent of the statute and who can be subject to it, making clear that the statutory language, which says whoever, there's not a limit on that other than the conduct of the defendant. And that's the limiting principle in the statute. So one of the arguments you make is that the plaintiff here is in economic straits that make this not a choice, that they have to do it. Suppose this was a civil contendor on which that part of the dynamic was not present. So, for instance, someone refused to testify. So now they're a civil contendor. They're put in this situation. And so there's no urgency for them to earn, but there's the choice of stay in jail or work towards getting out of that situation. Is that similarly coercive when there isn't the same economic component? I think not, Your Honor. I mean, I think one thing is that that person might not find themselves in the recycling center. It's the sort of financial desperation combined with the promise of work release that works to coerce the labor of these individuals. Sorry, if I could just add. I will say it is possible that if the person, in Your Honor's hypothetical, were to work at the recycling center and then subsequently bring a CBTA claim, they might be able to state a claim, but I think the defendant would be able to argue later in the case that the real reason that they worked was not as a result of the defendant's coercion, but because they were bored or some other reason. I always use the acronym. My clerk has said I should say FLISA. That's what I think, Your Honor. Okay, good. FLISA. Right. We're old school about that. So on the FLISA claim, right, thinking about economic reality and so forth, there has to be a measure of voluntariness in order to make it work, or at least that's, I think, the argument that's posed. How should we think about the FLISA claim and the notion of voluntariness? I respectfully disagree with Your Honor that voluntariness... Well, it's not my proposition. Okay. Right? Well, I disagree with that. It's something that has been argued. Yes. I have no proposition. In our view, voluntariness really should not play any part in the determination of whether these individuals are covered by FLISA. Instead, what's important is, well, first of all, the district court's order creates a blueprint for private companies to obtain effectively free labor to their unfair advantage. And although there are a number of cases involving imprisoned workers where those workers are found not to be protected by the statute, this case is distinguishable because it involves work performed not within the prison but outside the prison and for a private company. And so that undermines the goals of the statute, both in terms of ensuring a baseline standard of pay for all workers who are covered and also ensuring fair competition in the marketplace. And so I allege that this case is more similar to the Fifth Circuit's decision in Watson v. Graves or the Second Circuit's decision in Carter v. who were working for outside employers. And in both of those cases, what the courts look to are the traditional economic reality test types of factors. Who is controlling the day-to-day work of the worker? Who is governing the terms and conditions of their work? And here we've alleged that both county personnel and the LRCA, the private company, had authority to terminate these workers. They jointly determined work rules and procedures. They jointly determined the days and hours of work. And they jointly supervised the debtors' work at the facility, making sure that they worked quickly. And if they didn't work quickly enough, we've alleged that either prison guards or center staff would punish them, for example, by omitting portions of their lunch. So under these circumstances, we've made sufficient allegations to at least, for pleading purposes, allege a claim of employee status under the Fair Labor Standards Act. Just going back to the involuntariness part, you analogize this to cases where, for instance, a petitioner for immigration relief was asked to drop their legal claim as a consequence of not participating in a program, right? What is it that the plaintiffs here are being threatened with having to do or not do if they don't participate in the center? So just to respectfully correct Your Honor a little bit, in the immigration cases, as far as I'm aware, they're not threatened with having to drop their immigration case. It is just that possibility exists for them to get out of the circumstances in which they're found. In Barrientos, the plaintiffs allege that the voluntary work program was operated as a deprivation scheme. So in order to get the basic necessities of daily living, these individuals had to participate in the voluntary work program. So they're threatened with not having the daily necessities of basic living if they don't participate. What is it that the plaintiffs are being threatened with as a deprivation if they don't participate in the center? Ineligibility for participation in work relief that the state court deems them eligible for. And if they don't get that, then where are they? Then they remain in prison for the full 12 months, in Mr. Borrell's case of his term, unable to leave the prison on a daily basis, earn money in the marketplace, and have that money presumably paid out to them from their commissary accounts when they leave the prison. And that, in turn, would enable them to get out of the indebted situation in which they find themselves. Can we just pick up at the 12-month period? So the 12 months are over now. May I assume that between months 1 to 12, or I guess between 0 and 12, the debt owed, obviously, well, it's not obvious, I'm asking you, continues to accrue? Yes, that's what the child support statute says. The payments don't cease to accrue due to incarceration. Right, so my $2,000 is there, or whatever the number is, I know that $7,000, $2,000, whatever, just assume $2,000. So my $2,000 is there. My $55 a week for 12 months is now there, right? It's not $55, it's $25, $5 a day. No, not the amount earned. Oh, sorry, sorry. The amount owed. Yes. Right, that's what we're talking about now. Okay. Well, my $55 a week continues to accrue, right? Correct. So at the end of 12 months, I owe whatever, you know, 52 times 55 plus 2,000, right? So the first day of the new year, I owe all of that money. I can be brought back again as a civil contender having to face a greater debt. Now, the purge amount, presumably at that point, would be different, right? The court would make whatever determination it makes. That's not really what I want to focus on. I just want to make sure I understand. At that point, you have a new purge amount, and you'd be subject to being rendered a civil contender and going back to jail. It seems possible, Your Honor, and it seems possible that there's a potential, you know, sort of never-ending cycle here, and that, in turn, helps keep the recycling center running. Good morning, Your Honor. May it please the Court, Catherine Lamb for the United States. So we've been talking a lot about choice in the forced labor analysis, and our concern here is that there is no pleading requirement about lacking keys to the prison or having absolutely no choice in stating a forced labor claim under Section 1589. There's no textual or purpose-based reason for importing such a requirement. That language comes from the separate context of whether or not someone is lawfully incarcerated for civil contempt, and to apply it in this context might improperly narrow Congress's broad statute in the carceral context and potentially even beyond. As my colleague said, the statute focuses on whether or not, on whoever imposes certain prohibited means on an individual to cause them to work. It applies across contexts, and it does not have any exclusions. The District Court's no-keys-to-the-prison pleading requirement, which I would point out no other court has adopted, would forego the statutory analysis and Congress's focus on these specific prohibited means in any scenario in which the victim has some theoretical means of extricating themselves from the labor. What's the difference, though? Is there a meaningful textual difference between coercion, carrying the keys, choice, or are these all sort of aiming at the same concept? Where do you see the difference? Certainly coercion is at issue here, but Congress defined coercion in a specific way in the statute.  It said do not cause someone to labor by any of these specific means, by wielding of force, by wielding of serious harm, by wielding of abuse of law or process, and then it asks whether or not the labor was ultimately caused by one of those means. Yes, certainly we are talking about coercion, but Congress did not endorse some sort of freewheeling analysis of whether or not a choice was big enough or small enough at the outset. So to focus on that at the pleading stage certainly is improper. There's simply no requirement that an individual be able to get themselves out of the circumstances in some manner. Does that mean that since the focus should be on coercion, it shouldn't be on the economic reality? So in the hypothetical that I posed to your colleague, playing out the different wages per hour, so if I'm understanding you correctly, if they were paid $100 an hour, that would be of no moment in the applicability of the statute because the key is coercion, not necessarily the economic coercion, but the coercion to do the unsavory job, or am I not thinking about it the right way? Well, I might answer the question somewhat similarly to my colleague. It would be a trickier question. Economic circumstances or financial harm is within the definition of prohibited serious harm under Section 1589.8.2 and then implicitly 8.4 and the definitions there in, I guess, C.2. So the wielding of an individual's vulnerabilities can be a basis for violating the statute, but the question is whether or not the defendant knowingly used those means to get the person to work. So the ultimate question isn't necessarily, or certainly the threshold question, isn't whether or not the person who is the victim had a choice or any choice. And I guess I would, I think it's important to keep in mind, when we're talking about Section 1589 and we haven't really differentiated that from involuntary servitude or Section 1584 derived from the 13th Amendment. I presume you're not taking a position on it. No, we're not. But I think it's important here because in many of the defendant's briefs, they conflate the two. Section 1589 was passed in response to the Supreme Court's decision in Kuzninski, which narrowly construed involuntary servitude to be this sort of no choice between it's either labor or physical and legal coercion, right? Section 1589 was expressly enacted to go more broadly and to address other forms of coercive labor practices. So we can't simply look at the question under those cases and see those as controlling necessarily here. It's important to look at what Congress  which was to go more broadly. So let me ask you this question. I know you saw red and you thought... Well... So tell me what role does the theoretical ability or inability to pay the purge amount should play in all of this analysis? I think I know what your answer is, but... Well, Your Honor, I'm going to say the pleading stage, it plays no role. Because if we were to say that anytime a detainee can pay some money or self-support or go pay bail to get out, if anytime that's the case, then they don't have a claim, then labor could be coerced by any number of deeply concerning means without causing any problem under the TVPA. A very wealthy person could be held in contempt for failure to pay child support. And yes, they might be able to pay the money, but that doesn't mean that we can beat them every day to make them go work in the recycling center, right? But you're adding in a fact there, counsel, right? I mean, I was with you, but then you threw in that we could beat them every day. There's no allegation that that's occurring. So you can't... So take that out of your hypo and now restate the theoretical that you're concerned with. Absolutely understood, Judge Meadey. But the reason I throw it in, not to resist your alteration of the hypo, the reason I throw it in is that if the district court's pleading requirement stands, the beating would actually be out of the statute because that individual, the very wealthy individual, could pay their way out and then presumably that would be fine under the TVPA. But we don't need to go that far in this case. Volitional conduct on behalf of the... You know what? I'll leave you at your last moment because you don't need to go that far. So maybe back up from that hypo because you have to... You're introducing now volitional conduct that is well outside of the facts of this case on behalf of the defendants. And one, that's not flagged, so I don't think it's part of this, but I don't see how that wouldn't change the contours of the argument that you're making. And I don't think it would, and I apologize if that was sort of complicated, the facts here. The reason I raised it is that the district court imposed a threshold question that would take us outside of the statute. But let's just work with the facts here. The TVPA has no application to any person who is lawfully civilly confined for civil contempt under the district court's rule. If you answer the question, yes, you have the keys to the prison, so you're lawfully civilly confined, then the answer, do you not have the keys to the prison, which is the district court test for pleading a TVPA claim, then you're out of the statute. So we take issue with that because it's a... Because they're saying there's no coercion. Again, and that's why your additional fact of there being some sort of violence adds in that element of coercion. Now you have to do this or we're going to continue to deprive you of something else. But as I understood it, the district court said all that's happening is the defendant is administering a civil contempt order that has been lawfully imposed. And if you work or you don't work, you're in the same position. You're still subject to the civil contempt order. You still have the option of paying the purge amount, challenging the purge amount, or serving the civil contempt sentence. And the contours of that don't seem to change based on the ability or inability to participate in the work. So a couple of thoughts in response to your question, Judge Mead, and I hope I can get to both by the time I start talking. So first off, Congress defined, as I said before, what illegal coercion is in this case. Force is one of the forms. It's also one of the forms to abuse law or process. So to use the law for a purpose for which it was not designed or to impose some sort of serious harm, which includes, as we discussed earlier, manipulation of a victim's financial status or psychological situation. So all of those go together under the statute that Congress wrote. As to what I think was some of the rest of your question, the analysis that you have done, Judge Mead, I think is a little bit different from what the district court did here. The district court said, you can't even get into court because you have the ability to pay the purge. The statute doesn't have any baseline requirement of being unable to get yourself out of the scenario in which you are forced to work. And if it did, that would cut not only a bunch of civil detainees, as we've talked about in our brief, like the immigration detainees out, it might stretch even more broadly. You can imagine victims of sex trafficking who aren't, they're not chained in the room, they're not locked in the basement, they could potentially leave. But if you apply a keys to the prison fleeting requirement, those folks would be out as well. Individual, I mean, we can look at cases like, I suppose, Callahan involved an intellectually disabled woman who ended up in sort of a domestic servitude situation with members of her cohort or friends. It seems that, as I read the case, she came into the situation voluntarily and she could have walked away. But that's not the pleading requirement. Ultimately, the court may have to, at some point, assess, or the fact finder may have to assess whether or not coercive means actually were used to procure the labor. And perhaps there is some consideration, as this court said previously in Burrell 1, about whether you have the keys to the prison. But that's not what you need to say to get into court. And if you did, this statute could potentially be vastly reduced in its scope, contrary to what Congress clearly intended. But we're not there. We're at a 12B6 situation. Yes, Your Honor, and I think that's a great point. You're talking about pleadings here, and the district court needs to assess under the statutory standard to look at the text of Section 1589 to figure out if plaintiffs have pleaded their claim. This isn't the ultimate question. Right. Thank you, Your Honor. We do ask that the court hold that the district court applied the wrong standard in dismissing plaintiff's claims, and that it vacate and remand for further proceedings under the correct standard. Thank you. All right. There's a lot of folks who are going to come up. You're all welcome to come up in whatever order. Is it Mr. Heisler? Yes, Your Honor. Okay, very good. Who's going to reserve time for rebuttal? I'm not going to. Not for rebuttal. I lost my head. What order are we going in? That's what I wanted to ask you. Five minutes, three minutes, seven minutes. The other David's the last. Okay, Mr. Overstreet, you're seven minutes. I just wanted to make sure that's what I had on time. Go ahead. Sorry. Your Honor, Judges, my name is David Heisler. I'm here on behalf of Lackawanna County, an appellee in this case. Also, technically, I guess, I'm for Thomas Stafford. He's been dismissed as a party. It would be interesting to note at this point in time, it was touched upon some of the various questions that were asked to step back and see how we got to the point of how this case arose. It's interesting to note that each of these plaintiffs, the named plaintiffs, readily admit that they did not pay their child support. Each one of them had their day in court under the state laws in the state judiciary system, and it was determined beyond a reasonable doubt that after the date of the adjudication, they had the money in the whereabouts to pay a certain purge amount. If they didn't believe that or disagreed with that, they could have filed an appeal. Now, at this point in time, we're at an important juncture. They're going to pay that amount, which the judge said, you can appeal it, let none of that happen here so we can dismiss that for the moment, or incarcerate it. So at this point, this is the real decision that's being made. Should they pay today, or should they go to prison for up to six months? Each one chose not to pay. Each one chose to go to prison for up to six months. Burrell had a double whammy there. He has six and six. Now, Burrell's case, went to prison. Once he got there, he was interested in work release, which most of them are. Help me about this. The situation that bothers me is, how is this not overt economic exploitation, right? So 63 cents an hour, $5 a day. Now, you can say, well, you can choose to make it to work release or not, but that circumstance seems inherently coercive. It is not coercive because they don't have to work for it. What's going on here, actually, in each of these cases, a judge decided the case under state law and put them in prison. I'm here on behalf of the Lackawanna County Prison. We had nothing to do with any of that. We only execute. They come with their order. Well, help me with my problem, because I didn't ask you about that. Well, your problem is, there's no claim for exploitation of a wage loss claim here under these circumstances. There's Pennsylvania Minimum Wage Act, the FLSA. They're all there to handle that case if they apply, but they do not apply in this case. I think Judge Greenaway's question, if I understood it, was they're there now, so why does the process that occurred before their arrival at your facility make any difference to what the facility's doing to potentially coerce their participation in violation of the TVO Act? Getting up to a more fundamental question, what has that to do with Lackawanna County, the prison itself? They arrive. Their incarceration has nothing to do with the prison. That's the judiciary. They come with their order. Now I understand the agents don't understand, because he said it differently, I wouldn't say more articulately, but we both have the same issue, and we didn't either answer either question, right? So help us answer our question. Forget about what happened before, right? You want to focus on that, I don't. The question is they don't have, and the answer is they don't have to do anything other than run out their time in jail while getting food, clothing, shelter, medical attention. So you could do anything you wanted then. So your argument to us is your client can do anything it wants to these civil contempt orders, and there'd be no way to articulate a claim. That's my point. My client is not doing anything it wants. Everything that my client does, the prison, Lackawanna County, is done not on its own, but pursuant to court orders. The court does not order that these civil contempt orders work under substandard conditions for 63 cents an hour. Right. The court does not order that. So help me. Why isn't having these folks work under these circumstances course? But we're not having them work. They're volunteering to work. Mr. Hazard himself. Could you charge them, you pay them 63 cents an hour. Could you pay them 5 cents an hour? Would that be coercive? They're not coerced to take it. That's what I'm getting at. They do not have to work at all. We're having a failure to communicate. Could you charge them 5 cents an hour? I'm sorry, not charge them. I'm so sorry. Could you pay them 5 cents an hour? Would that be a felony? If they accepted it, yes. I like your original hypo. Could you charge them 5 cents an hour? Well, we don't in this case. Who makes the determination as to whether this prisoner can have work release? The court. They cannot go into work release unless the court orders it. So if they were interested in getting court into the work release, they have to go to court as Mr. Hazard did. He states that he petitioned the court to be put on work release and was denied. And he further states that Mr. Hazard stated that he was informed by the court that in order to qualify for work release, he first had to participate in the community service program. Same thing with Mr. Stuckey. He found out that they had to go to court to get permission. They have to go to court to get permission to participate in the program. We don't say you just go start working there tomorrow for $5 an hour. They know what the situation is. Then they have to get an order from court to participate in the community service program, which they did. Mr. Hazard got one on May 22, 2014. He was transferred to Lackawanna County Prison Community Service Program by order of court. The court doesn't say pay them 63 cents an hour. No, but the court knows what the program is. So the court's imprimatur allows you to do anything you want to do. Is that the argument? We can put up, we can establish whatever program we want to, which the court and or the contemnor can take or leave. They can just sit there and not do anything and run out the clock, so to speak. There's no coercion whatsoever. On day one they had the ability to pay and they chose not to. This is actually an attack on not what the prison is doing. It's an attack on the whole system as set up by the legislature and the child support laws and the judiciary that enforces them. We just get the end product. They want to change the law, the work release law. Generally the way this works is I beg your pardon, you wait, and then answer my question. Sure. Can we do that? Yes. All right. So here's what I'd like to know. Is there any circumstance under which a civil contemnor can bring any claim under the FLSA or the TVPA in your view? Yes. What circumstances? Well, going back to the Department of Justice's brief on this, they presented a number of circumstances. First they determined after going through, there's a number of circumstances where you can get out, where you supposedly have your own key. Ultimately the question proposed was, it does not follow that each detainee therefore can be required to work by statutorily prohibited means for the benefit of a government or private businesses. Further it states that the question is whether or not detainees are prohibited from being forced to work by means of prohibited means. So what are those prohibited means? They list a number of them. Solitary confinement, denials of personal necessities, threatening to deprive them of food if they do not work, threatening false criminal charges against their family, all pretty coercive stuff. And in all those cases they can bring a claim under the TVPA. Does that answer your question? So you can, I get it. You can pay them whatever you choose to pay them and they have no recourse. You can choose to have them work in whatever circumstances you choose and they have no recourse. And you can derive whatever benefit of that economic circumstance a lot. Well, it's not what we choose. We provide options. It's what they choose in accepting those options. And even when they do accept them, as I just pointed out in TVPA cases, it's not unfettered. But they're talking about things which are not involved in this case. It was brought up moments ago, beating, not in this case. Depriving food, threatening family members, solitary confinement, depriving necessities. None of that is involved in this case. As was pointed out earlier, there's absolutely no compulsion upon these detainees to go to work. Is there an economic benefit to the county by paying 63 cents an hour as opposed to $7.25 an hour? Is there an economic benefit to the county? Indirectly in the sense that these services go to all the municipalities where recycling materials are picked up. So not just the county, it's not the county itself. It's the municipalities within the county. So indirectly, it benefits them that way because the recyclables are being recycled at a lower cost. And that benefits everybody in the county and it benefits all the individual municipalities. Next slide, please. Okay, thanks a lot. Thank you. Good morning, Your Honors. May it please the Court, my name is Sarah Lloyd. I'm here this morning representing the defendant appellee, Lackawanna County Solid Waste Management Authority. And initially, I had planned to focus and redirect the Court's attention a little bit to policy arguments that bear on the substantive issues that my co-counsel were going to address. But I just want to, since one issue that came up during argument actually ties into that, I think Your Honor asked a very poignant question when you asked, how is this not overt economic exploitation? And I think the answer to that is that this is not a work situation. It's community service. And generally, there are policy considerations behind the Court requiring. I'm confused by one thing. If it's community service, how do all of the seeming factors under economic reality seem to apply? These individuals have no control over how it is they do community service. You know, I do a lot of community service. I don't get paid for any of it. But, you know, I arrange it, you know, within my schedule and, you know, the time I can do and this and that. That doesn't seem to be what's happening here. So what's the community service argument? I think part of it, Your Honor, is the framework. So you have to see it, I think, in a different context than maybe it was presented initially by the appellants. So the situation works like this. There is a prison policy that makes eligibility for work release contingent upon a certain period of community service in this situation where the Court's made a determination that there's a willful choice to avoid paying child support obligations. So the Court, on board with this, is recognizing the problem that we have here is the willfulness because we've already determined that they have an ability to pay. Now, that can be disputed factually, but the Court's determination was that there was an ability to pay. So what I think the Court is trying to do, and I think what also the prison is trying to do, is say, okay, you were outside of the prison walls. You have the ability to look for a job, to do these number of things, and that didn't work. Like, we didn't get there. And it may be for one reason or another, and I'm not going to judge the specific individual reasons, but I just want to point out that it's important to recognize that that's a point where, okay, they're in prison, right? Now all of those problems that prevented them from making very modest child support payments are dissipated. And now they want work release and they want to be paid for it, and the stipulation is okay. But because you're in this situation, we want to instill good work habits, good work ethics. Does that mean in the hope of instilling good work ethics that you can create both an economic and work environment that is coercive and exploited? So in terms of the work environment, I will just say that I represent the authority and the authority doesn't actually operate the facility or the conditions for it. So that part of it, and I'm not going to say that that's not a relevant point to ask about, just that it's not directly pertinent to. Is there an economic benefit that the authority derives? Well, so I think initially, yes. There is an economic benefit in the sense that people pay to recycle their garbage, right? So in the sense that it is more cost effective to do that, you know, there is a benefit. And I'm not denying that. So there's a benefit that the authority derives by using these community service as opposed to a private company providing those same services that the authority would benefit from but pay a higher price for, yeah? Yes. And I just want to characterize briefly before I hope I have an opportunity to get a little bit into the policy arguments, maybe not. But in this instance, they're not being paid wages. So the $5 that they're receiving is remuneration that is limited by the prison policy. So they actually, when they're in community service, they cannot receive more than $5 for that. And I think that's pertinent. That's according to what? I apologize, John. I didn't hear. That's according to what? That's according to the prison policy. So the rate that they can receive, and this is because it's not a wage, right? So it's not a work release program. So if you're doing community service. This is in the record? What you're about to say about the $5, that's in the record? Yes. Yes, ma'am. Go ahead. So the amount, the maximum amount that they can receive is actually set forth in the prison policy. And the reason for that, the reason why it's capped is because it applies just specifically to not work release. This is not work release. There's a distinction. This is community service. Now, so what the authority is doing is just making the facility available as a place where community service can be completed. And I'm out of time. So I don't know if anyone has any questions. Just favor this one. Thank you. Good morning. Or is it afternoon? I'm not quite sure. My name is David Overstreet. Good morning. Still morning. Fantastic. And I represent the Lackawanna Recycling Center in Mr. Dominick and Naples and Mr. Lewis and Naples. And so I have slightly different concerns than some of my co-parties in this case. But I'd like to start with a common concern, and I'd like to start with the issues the DOJ seems to be wrestling with. And I would suggest, frankly, that this is not the case they think it is. And I'm going to try to tie these things together because they wander all over the place, and I apologize if I'm not articulate about it. But this concept of coercion, which I think everyone agrees has to exist in order to have a TVPA claim. Coercion has to be a threat of incurring some harm that one would not otherwise incur, right? It has to be something beyond what one is otherwise going to be visited upon, right? So here, why does that matter? Well, that really matters here, and why Judge Mariani was spot on to talk about the keys to the jail cell, is because here, to the extent the plaintiffs are relying on the fact that they're incarcerated, in and of itself, full stop, no beatings, no solitary confinement, nothing else but just the threat of incarceration, that didn't arise in any connection with the work release program or work at the center. They were incarcerated because they made the decision to not pay their child support. And again, they had a remedy. And keep in mind what was actually pled here. The claim that was actually pled was this first theory. That was the injury. The initial incarceration was inappropriate, and we, therefore, they string together the causal connection. We, therefore, need to make money in order to get out. But essentially, it comes right back to the fact that it was the initial incarceration, which is the force, which is the compelling motive. They want out of jail, right? Well, that's where Judge Mariani says, in this case, factually, you have a problem. Even if we accept all the facts as you've pled, you have a problem. And the problem is that the state court found beyond a reasonable doubt that you could avoid jail, right? So this isn't choice in the choice sense you see later throughout the TVP cases generally. This is a threshold problem with their case, that the reason they're incarcerated in the first case and the reason that incarceration cannot be the source of coercion is because they're going to suffer that incarceration for reasons totally independent of the market. Let me ask you a question. So the purge amount is the purge amount. We've already been through how you could contest that and so forth. But the purge amount remains, right? If the argument is I choose to go to jail, right, the court has set a purge amount, which the court says you can pay, right? If you don't pay it, it's not as though jail dissipates the debt. That remains. Correct. So at the end of six months or 12 months, you don't owe the purge amount. You owe the purge amount plus, right? There may be some accruing interest or some additional charges that build into the purge amount, correct. But you essentially owe a purge amount. More, right? That's all I'm saying. It's the purge amount plus, right? I agree. Okay, great. So you have to ask yourself if that's right, and I know this is sort of not our point, but tangentially our point. If that's right, like there's no benefit to going to jail, right? If you could pay and you choose not to, it's not as though at the end of the term your debt is dissipated. Well, that's correct, Your Honor. But that, again, what we're in search of is coercion within the context of a TCA claim, right? Right. So what choice do you have once you go in? As I understand it, if you want to get to work release, you've got to do community service. And if the circumstances of community service are coercive, then? I think the problem with that is it starts in analysis one, step two, far downstream. Because you have a choice under the state law, and the state law is very clear. And, in fact, in the reply brief, the plaintiffs make a mistake. You can change the purge amount. There is a rule of civil procedure, 191019, and Section 4352 of the Pennsylvania Consolidated Statutes make it very clear that if your financial circumstances change, things are getting worse for you. Even if the court were right when it locked you up for deciding, you know, I could pay your child support, that if your financial circumstances change, you can come back to this court at any time and seek to have your purge amount lowered. And that's the remedy, Your Honor. And that's, you know, first of all, the change financial circumstances case was not pled. Judge Mariani gave them the option to re-plead. They stood on their pleading. They stood on theory one, right, which was it was wrong to incarcerate them in the first place. The state court was wrong. Judge Mariani explained, well, you can't really go there, right, because you'll run into Rook or Feldman. They're effectively collaterally attacking a beyond reasonable doubt finding. And, moreover, you have a state remedy, either an appeal or come back to petition under 4352. But if we were to entertain a change financial circumstances case, aside from the fact that it was not pled, there is a remedy, right? There's a remedy to your very fact pattern. And so the ongoing incarceration, because they choose not to avail themselves of a state court remedy, cannot be coercion in the TVDA sense. If they're working for 63 cents an hour, if they earn five cents an hour, would that be coercion? And, again, I think we need to be granted the facts, right? Everyone agrees that perhaps there's a problem with Pennsylvania's system. But, again, we have to answer your question to the prism of what are the claims that are actually brought, TVDA and FLSF, right? I'm going to answer that question from a TVPA perspective. In this case, it doesn't matter. It's easy, right? I mean, they're not making the minimum wage. But, yeah, go ahead. From the TVPA perspective, that doesn't matter in this case. And that's why the DOJ's concerns that this is going to destabilize the core civics holdings and the INS holdings, that's just entirely misplaced. Because in those cases, as this court recognized in some earlier questions, there's always incremental harm, right? It's not the fact that those INS detainees are being detained. It's when they're detained, they're being threatened with solitary confinement. So can you charge, can you pay them five cents an hour? There's nothing in the TVPA that precludes from not paying them anything. In other words, again, the TVPA was in search of coercion. So having them work for free wouldn't be coercion? No, no, no, no. You have to, again, from a TVPA perspective, the question is what is the harm that would be visited upon these people that is being threatened if they don't work, right? And here, to the extent they're relying on confinement, which is all they've pled, that is not a harm that results because they won't work. They're not being threatened with confinement if you don't work. I thought part of their claim was the circumstances under which they were working. They tried to suggest that that's relevant to the TVPA claim. We're suggesting that it's not because, again, you have to look for coercion in every fact pattern, irrespective of the 1589 context, one, two, three, or four. You have to have coercion of some sort. The threat that something is going to be, a serious harm is going to be visited on you, sir, if you do not work. And here, the only threat they had is we're going to have to remain in jail. But that's where the keys, that's where Judge Mariani was spot on and why this doesn't do violence to the DOJ's position. It doesn't undermine the purposes of the TVPA. That's just simply not true. And moreover, if you pivot to my clients, right, and this is incredibly important because my clients have been sued as venture defendants, right, not perpetrators. They've been sued and the argument is they knew or should have known that someone else was engaged in a TVPA violation. Well, if you look at the actual allegations in the complaint, look at the reply brief. They cite three things, right? They cite that there were horrible working conditions, that someone was paying them less than minimum wage or some de minimis amount. There's no allegation that we actually knew that. They lumped that together in their lump pleadings and say defendants, that's inappropriate. Those allegations should be thrown out. But they are not considered for 12 and 6 purposes. But let's assume we give them the benefit of the doubt. We consider all that. There's not a single allegation that Mr. and Mrs. DeNaples or the center as a legal entity knew that anybody was engaged in a TVPA violation. Look at what they have to allege. If their theory has not changed financial circumstances, in order to prove that my clients knew or should have known, we'd have to know that when Burl went to jail he could have paid it but then his circumstances got worse and then he couldn't pay it and he couldn't go to state court and he couldn't do that. That's inference upon inference. How could my guys know that? Well, this is maybe something that your guys, as you say, I wouldn't say that, but you did, that you guys know. What's the economic benefit that the LCRI and DeNaples derive from the work of Burl et al.? Well, that's simple, Your Honor. I'm not going to stand here and deny that there's not some economic benefit to having prison labor provided at a center that you're operating for the county, in due economic benefit. But that's not the question. I understand. And your corporation's for-profit, so you're not on community service, right? Your clients are not engaged in this community service. To the extent we're getting to the second factor of the FLSA and Congress's justification for it, I would argue that by operating a recycling center that is providing the mandated services under the Solid Waste Management Act, that we are not engaged in competitive commerce with it. But if that's not your question, Your Honor, then I'm not denying that as a for-profit entity or a not-nonprofit entity that, yes, economic return is important. But if we're going to the FLSA claim, again, as to my clients, then we would look at what is the nature of the relationship? To use the RAS Act's general formulation, setting aside the Uber cases of independent contractor versus employee, that's a different world, different test. But if we look at Watson, if we look at Carter, if we look at... Part of the economic reality test, would there be a deficit? I flip it over and argue what part of the economic reality test is met as to the Senate. They didn't know who these people were. They didn't hire or fire them. They didn't know their names. They didn't set their wages. They didn't pay their wages. They didn't interview them. They didn't select them. They had no relationship. They didn't even supervise them. The prison guards did. They had no relationship, let alone an economic relationship within the meaning of economic reality test. There was simply none. So I think from an FLSA perspective, at least with respect to the Senate, there's no indicia of a traditional employment relationship. How do we know all this from the tweet? It's in there. It's right in our brief. We explained. We walked through the allegations. I'm so sorry. I didn't say your brief. I said the pleading. How do we know that, everything that you've just said, from the pleading? Yeah, and what I misspoke, you know, and I meant that we explained that. We went through that precise analysis in our brief. And I will tell you that there are a dearth of allegations with respect to the Senate and or the Naples that would allow even an inference. But we're 12B6, right? So everything that you've recited is, of course, interesting, and maybe in the wash it will turn out to be either dispositive or quite useful. But that's not where we're at yet. Granted, we are going to give them every benefit of the doubt and allow every reasonable inference, but there still has to be some pleading rules here. There has to be a standard. And when they make no allegations from which reasonable inferences can be made with respect to my clients, then we have a 12B6 problem here. And I take, for example, their attempt to send a recode to our clients. And another error in their brief where they come right out and say that venture liability is an adequate predicate act, and they cite to the definition of racketeering activity. If you went and read the definition of racketeering activity, you'd see that it does not extend the venture liability. In fact, it's expressly excluded. It's not an indictable offense. Thank you. Thank you, sir. Just a couple points in rebuttal, Your Honors. First, taking counsel for LRCI and the Naples first, I'd just point out counsel suggested that our pleadings do not contain specific factual allegations sufficient to establish solicit liability as to LRCI. And I'd just point the court to the appendix pages 129 to 130, which do contain specific allegations about the center specifically, including that center employees jointly supervise debtors' work at the center, including but not limited to ensuring prisoners working on the line work quickly, and that if they didn't work quickly enough, prison guards or center staff would punish them. Also, the staff at the center directs the debtors' work, assign them workstations, how to perform their tasks, and so forth. So as Your Honor pointed out, Judge Greenway, here at the pleading stage, there are ample allegations to state a claim against LRCI. Likewise, as to the PDPA allegations against the individual defendants and the company that they own, the standard at the pleading stage is new or should have known. We've alleged that LRCI entered into a contract, an operating agreement with the authority, which specifically contemplated the use of work performed by prisoners. And that combined with LRCI's knowledge of the conditions at the recycling plant that it operated is certainly sufficient at this stage of the case to state a claim that they knew or should have known that their labor was not voluntary and in violation of the PDPA. As to the presence or lack of coercion, I would point the court to the fact that in addition to pleading that the defendants did in fact violate the PDPA, we also plead attempt claims here. And so even if they weren't successful in coercing these individuals to work, the defendants certainly attempted to do so. And just a couple of additional points since my time is short. As to the authority, a number of statements made by counsel to the authority about what the courts or the prisons are attempting to do are well beyond the pleadings in this case. And at this stage of the proceedings, it's not appropriate for considering whether or not we state a claim. And then finally, as to the county, the county's position seems to be that it took no action to create the circumstances that lead to the potential violations here. And that's simply not reflected in our pleadings. The county set this work program up. County employees inform debtors that in order to get to work release, they have to first work in what they've deemed this community service program under these atrocious conditions. And so the suggestion that they had nothing to do with it is belied by the allegations in our pleadings. All right. Thank you so much. Thank you, Andrew. And thanks to all counsel for their serious arguments today.